**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SHONTEL GRAY *for* A.J., | CASE NO. 1:23-cv-01511 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Shontel Gray ("Plaintiff" or "Ms. Gray") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI") on behalf of her minor child, A.J. (ECF

Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the

undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF

Doc. 5.)  For the reasons set forth below, the Court **AFFIRMS** the final decision of the

Commissioner.

## I.      Procedural History

On October 28, 2020, Ms. Gray filed an application for children's SSI on behalf of her

child A.J. with an alleged disability onset date of October 26, 2020.  (Tr.  15, 157-63, 167.)  She

alleged A.J. was disabled due to a learning disability.  (Tr. 56, 66, 166.)  The application was

denied at the initial level (Tr. 70-73) and upon reconsideration (Tr. 83-84, 86-87), and a hearing

was requested (Tr. 88-90).  A hearing was held on June 21, 2022, before an Administrative Law

Judge ("ALJ").  (Tr. 38-54.)

The ALJ issued a decision on July 7, 2022, finding A.J. was not under a disability within the meaning of the Social Security Act since October 28, 2020, the date the application was filed. (Tr. 12-37.)  The Appeals Council denied Ms. Gray's request for review on June 13, 2023, making the ALJ decision the final decision of the Commissioner.  (Tr. 1-6.)  The case has been fully briefed and is ready for review.  (ECF Docs. 10 & 11.)

## II.  Evidence

### A.  Personal Evidence

A.J. was born in 2010.  (Tr. 16.)  Under Social Security regulations, he was a school-age child at the time of the application and the ALJ's decision.  (*Id.*)

### B.  Medical and Educational Evidence

#### 1.  Educational and Treatment Records

##### i.  Educational Records

In October 2020, when A.J. was in the fourth grade, an Individualized Education Plan ("IEP") was developed and an Evaluation Team Report ("ETR") was prepared by the Cleveland Municipal School District with Ms. Gray's participation.  (Tr. 243-88.)  The ETR noted that A.J. repeated second grade and had a poor attendance record since kindergarten.  (Tr. 258.)  In the most recent year of school—A.J.'s third grade year—A.J. had missed 16 days before schools were closed due to the COVID-19 pandemic.  (*Id.*)  As a fourth-grade student, A.J. was reading at a first-grade level.  (Tr. 275.)  When school was conducted remotely due to the pandemic, A.J.'s ELA teacher noted that A.J. was attempting to complete his assignments but appeared to be struggling with completing them.  (Tr. 252.)  A.J.'s math teacher noted that A.J. logged on and participated daily, but had his mother sitting with him and supporting him at most times. (*Id.*)  Ms. Gray reported that A.J. was doing his work, but they had issues with the internet that

prevented him from being able to submit all of his work. (*Id.*) It was noted that A.J. needed to "increase his ability to focus and complete a task without getting distracted." (Tr. 252, 267.) It was also noted that A.J. needed to improve his attendance, since "[r]egular attendance [was] necessary for [A.J.] to access the general education curriculum and also receive any additional supports and/or intervention." (Tr. 263, *see also* Tr. 252, 267.)

Cognitive and achievement testing was performed as part of the ETR. (Tr. 259-60.) The Reynolds Intellectual Assessment Scales, Second Edition ("RIAS-2") was administered virtually on October 13, 2020. (*Id.*) A.J. wore ear buds during the remote testing and it was noted that: although there was a lot of activity going on at A.J.'s house during some of the testing, "he remained focused and on-task"; "[h]e followed directives"; and he "worked hard." (Tr. 259, 260.) He did not get frustrated and remained engaged, even though there were internet problems during the testing that required him to log back on three times. (*Id*.) The RIAS-2 test results were: nonverbal Intelligence Index of 98 (average); Verbal Intelligence Index of 72 (moderately below average); and Composite Intelligence Index of 83 (below average). (Tr. 260.)

Because of the "statistically significant discrepancy" between A.J.'s nonverbal score of 98 and his verbal score of 72, "an abbreviated IQ test was administered the following day to obtain additional information." (Tr. 260.) The Kaufman Brief Intelligence Test, Second Edition ("KBIT-2") was administered on October 14, 2020. (*Id.*) During this testing, A.J. "was in a room by himself and it was much quieter" and "the internet connection remained stable for the 20 minute testing session." (*Id.*) The KBIT-2 results reflected equally developed verbal (79) and nonverbal skills (72), both below average. (*Id*.) A.J.'s composite I.Q. on the KBIT-2 was a 72, also below average. (*Id*.) A.J. was engaged during both remote testing sessions, and it was noted to be unclear why there was a discrepancy between the RIAS-2 and KBIT-2 results. (*Id*.)

3

The Woodcock Johnson Test of Achievement, Fourth Edition ("WJ-IV") was administered virtually on October 13 and October 14, 2020.  (Tr. 261.)  On the WJ-IV, A.J. "demonstrated good phonetic skills on the Word Attack subtest (87).  Reading sight words in isolation on the Letter-Word Identification subtest was low (74). In Math, he relied on his fingers to solve, indicating he ha[d] not mastered math facts. In addition, he was not able to solve multistep problems (76)." (*Id*.)  When encouraged to do so, A.J. used paper and pencil to check his math work.  (*Id*.)  He had neat and legible printing with good spacing.  (*Id*.)  However, he put a period at the end of each line even though it was not necessarily the end of a sentence.  (*Id*.)

The October 2020 ETR concluded that A.J. was eligible for special education services as a student with a specific learning disability in the areas of reading fluency and reading comprehension.  (Tr. 255, 267, 275.)  As part of the IEP, it was determined that A.J. would receive accommodations for ELA and mathematics testing, including "small group, extended time, directions read aloud, flexible seating, frequent breaks, [and] prompts to stay on task."  (Tr. 246.)  It was also determined that he would receive services from an intervention specialist.  (Tr. 248.)  Other accommodations in the classroom included: flexible seating; small groups when needed or use of a buddy; having directions broken down into smaller steps and repeated as needed; having work read aloud to him, especially math word problems; receiving visual and verbal prompts to stay on task; and using a timer for transitions and completion of work.  (*Id*.)

An IEP Annual Review was completed a year later, on October 28, 2021.  (Tr. 351-65.)  A.J. was in fifth grade and was described as well-liked by his peers, attentive, a student who was ready to learn, and conscientious when working on class work and during one-to-one evaluations.  (Tr. 352.)  Brigance Basic Skills Inventory scores placed A.J.'s reading-word recognition and vocabulary comprehension at a third-grade level; his oral reading was at an

upper-third-grade level; and alphabetizing words was at a fifth-grade level. (Tr. 356.) It was determined that A.J. should continue with "a reading goal and several objectives to assist in strengthening his reading skills within literary text, informational text and vocabulary [which] were well-below grade level based on NWEA results mainly." (Tr. 353, 356.) It was also determined that A.J. would benefit from a mathematics goal to assist with strengthening his computational skills (Tr. 353, 358), would continue to receive services from an intervention specialist for reading and mathematics (Tr. 359), and would receive accommodations for districtwide and statewide testing in the areas of ELA, reading, writing, mathematics, social studies, and science. (Tr. 362.) The accommodations were to include small group setting, frequent breaks, extended time, reading when allowed, and directions clarified. (*Id*.) During the 2021-2022 school year, A.J. had 40 unexcused absences. (Tr. 349-50.) His fifth-grade report card reflected mostly failing grades, but he was promoted to the sixth grade. (Tr. 366.)

### ii.    Treatment Records

On September 21, 2021, A.J. presented for a routine well-child visit with his pediatrician Arian Nasab, M.D., at University Hospitals. (Tr. 321-27, 345.) A Youth Pediatric Symptom Checklist was completed at that visit, reporting that A.J. "never": fidgeted or was unable to sit still; felt sad or unhappy; daydreamed too much; felt hopeless; had trouble concentrating; got down on himself; acted as if driven by a motor; teased others; worried a lot; or took things that did not belong to him. (Tr. 323.) According to the checklist, A.J. "sometimes": refused to share; did not understand other people's feelings; fought with other children; blamed others for his troubles; and did not listen to rules. (*Id*.) The checklist also reported that A.J. "often": seemed to be having less fun and was distracted easily. (*Id*.)

A.J. had not been seen by his pediatrician since early childhood.  (Tr. 325.)  The main concern at A.J.'s well-child visit with Dr. Nasab was his weight.[1]  (Tr. 325-26.)  A.J. was counseled on nutrition and exercise and referred to a dietician at Ms. Gray's request.  (Tr. 325.) A.J. was in fifth grade.  (Tr. 326.)  Ms. Gray reported no issues at school except for "selective attention issues."  (*Id*.)  He liked school and math was his favorite subject.  (*Id*.)  There were no reported social concerns; he had friends and there was no fighting or bullying.  (*Id*.)  His recreational activities included playing video games, going to the park, and spending time with his family.  (*Id*.)  On examination, A.J.'s mood and affect were normal.  (Tr. 327.)

### 2. Medical Opinion Evidence

#### i. Treating Provider Arian Nasab, M.D.

On May 9, 2022, Dr. Nasab, who had known A.J. for eight months, completed a questionnaire on medical and functional equivalence.  (Tr. 345-48.)  He opined that A.J. had no evidence of limitations in the following areas: acquiring and using information; attending and completing tasks; interacting and relating to others; moving about and manipulating objects; and caring for self.  (Tr. 345-47.)  He opined that A.J. had moderate limitation in the area of health and physical well-being.  (Tr. 347.)  Dr. Nasab was not aware of attendance issues at school or the need for special accommodations, counseling, or assistance at school or home.  (*Id*.)

#### ii. State Agency Psychological Consultants

State agency psychological consultant Kristen Haskins, Psy.D., reviewed the record on April 27, 2021.  (Tr. 58-61.)  Dr. Haskins considered A.J.'s impairment under Listing 112.02 (neurocognitive disorders) and concluded that his impairment did not meet or functionally equal a listing.  (Tr. 58-59.)  Dr. Haskins then opined that A.J. had: no limitations in the domains of

---

[1] His BMI placed him in the 99th percentile.  (Tr. 327.)

attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and physical well-being; and less than marked limitations in the domains of acquiring and using information and caring for yourself.  (Tr. 58-59.)

State agency psychological consultant Deryck Richardson, Ph.D., reviewed the record on reconsideration on November 12, 2021.  (64-68.)  Dr. Richardson considered A.J.'s impairments under Listing 112.02 and concluded that his impairments did not meet or functionally equal a listing.  (Tr. 64-66.)  He opined that A.J. had: no limitations in moving about and manipulating objects and physical well-being; and less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.[2]  (*Id*.)

### iii.    Consultative Examiner Michael Faust, Ph.D.

A.J. presented to clinical psychologist Michael Faust, Ph.D., on March 30, 2021, for a psychological consultative evaluation.  (Tr. 233-42.)  Dr. Faust reviewed school records from the Cleveland Municipal School District, including A.J.'s ETR and test scores from the RIAS-2 and KBIT-2 in October 2020.  (Tr. 234.)  Ms. Gray reported that A.J. repeated second grade and was in third grade at that time.  (Tr. 235.)  However, Dr. Faust noted that A.J.'s ETR reflected he was in fourth grade.  (*Id*.)  Ms. Gray reported that it was A.J.'s first year of receiving special education instruction for his learning disability.  (*Id*.)  She said that A.J. had difficulties with learning, noting that he sometimes had to be told things in a different format because he would get distracted and not listen.  (*Id*.)  She said he struggled with math and reading, adding that she felt like he struggled in all areas.  (*Id*.)  A.J said he struggled with "just reading sometimes and sometimes math [got] hard."  (*Id*.)  Ms. Gray also said that A.J. had problems with attention,

---

[2] Dr. Richardson observed that the initial ratings provided by Dr. Haskins were made before A.J.'s teacher provided her ratings.  (Tr. 65.)

explaining he got distracted by other kids around him, had to be reminded to stay on task, forgot to turn in homework, and was disorganized.  (*Id*.)  Although Ms. Gray reported issues with attention and said A.J. was easily distracted, she denied he was hyperactive.  (*Id*.)  She reported that A.J. was in a couple of fights when he was in second grade but denied any other issues with aggression.  (*Id*.)  She said A.J. needed daily reminders to take a bath and needed help picking out his clothes.  (Tr. 236, 237.)  She also reported he had difficulty making and keeping friends because he did not "talk enough."  (Tr. 237.)  For recreation, she said A.J. liked to "play games" and "play on his phone."  (*Id*.)  He reported he wanted to be a doctor when he grew up.  (*Id*.)

On mental status examination, A.J. made good eye contact and did not show attention problems.  (Tr. 236.)  He was "attentive and showed no problems with being hyperactive, impulsive, or distracted."  (*Id*.)  He was "rather quiet and reserved," but "he put forth good effort throughout the testing administration and was viewed as motivated to engage and respond to questions."  (*Id*.)  He exhibited a "slower rate of speech, consistent with learning issues," but his speech was fully understandable in all contexts, and he did not otherwise show any significant speech problems.  (*Id*.)  A.J. provided simplistic answers with limited content, requiring multiple follow-up questions, but was motivated to respond to questioning.  (*Id*.)  He exhibited no issues understanding simple directions.  (*Id*.)  He had difficulty understanding complex instructions but could understand more complicated instructions if they were broken down into smaller segments.  (*Id*.)  He did not appear anxious or depressed.  (*Id*.)  His affect and mood were normal.  (*Id*.)  He presented with "a rather stoic personality but was easy to engage and responded with good effort throughout the session."  (*Id*.)  He "sat calmly and relaxed" during the examination.  (*Id*.)  His attention was good; he was not hyperactive; and he showed good frustration tolerance and was

persistent for all tasks. (Tr. 237.) His thought processes were consistent with a child his age.

(*Id.*) Dr. Faust observed the following regarding A.J.'s sensorium and cognitive functioning:

> [A.J.] was conscious and alert throughout the exam. He tested within the borderline range of intellectual ability during the session today and this is consistent with his clinical observations and special education placement in school. Today, [A.J.] put forth consistently good effort and persistence at interacting and completing mental status tasks. His fairly simplistic speech, concrete thought processes, and difficulty understanding complex or multi-step instructions are consistent with clinical observations and previous test results. Here today, [A.J.] completed 5 digits forward and 3 backward. Abstract thinking was rather simple, but he did recognize that a horse and a cow are both "animals".

(*Id.*) A.J.'s insight and judgment appeared limited based on his age and limited intellectual functioning. (*Id.*) But his mother reported that he understood there were consequences for his actions, was responsive to discipline, was respectful of authority, and was not openly defiant or oppositional. (*Id.*) Dr. Faust also observed that A.J. responded with adequate social judgment to hypothetical questions. (*Id.*)

Dr. Faust's psychology assistant, Kimberly Thomas, MA, administered the Wechsler Intelligence Scale for Children, Fifth Edition (WISC-V). (Tr. 233, 237-38.) A.J.'s scores reflected a Full-Scale I.Q. of 53, with the following index scores: 62 (Verbal Comprehension); 64 (Visual Spatial); 58 (Fluid Reasoning); 67 (Working Memory); and 45 (Processing Speed). (Tr. 238.) With respect to these test scores, Dr. Faust stated:

> [A.J.] put forth adequate effort on testing tasks but tends to be more reserved and withdrawn in presentation. He lacks confidence in his ability and this lowered his overall test performance. His performance placed him within the extremely low range of ability, but he is estimated to be functioning higher within the borderline range, consistent with his prior intellectual measures.

(*Id.*) Dr. Faust diagnosed A.J. with borderline intellectual functioning and concluded that no additional diagnoses were warranted. (Tr. 238-39.) He opined that: "Although [A.J.'s] mother said that the child has some difficulty with attention, there is no evidence of any diagnosable

attention deficit hyperactivity disorder. The ETR did indicate 'at risk' behaviors in hyperactivity, aggression, conduct problems, and attention; however, there is insufficient data necessary to substantiate any underlying ADHD." (Tr. 239.)

As to "acquiring and using information," Dr. Faust opined that A.J.'s attention was not limited, but he "would experience difficulty with acquiring, using, and recalling information" in a group setting "due to borderline intellectual functioning." (Tr. 239.)

As to "attending to and completing tasks," Dr. Faust opined that A.J. "exhibited no attention deficits and was attentive throughout the interview" and he was "neither distracted nor hyperactive." (Tr. 239.) He opined that, "[i]n a group setting, [A.J.] is not viewed to have difficulty with attention for completing tasks and is not reported to be distracted or disruptive." (*Id.*) He commented: "Additional communication with his school is necessary to rule out any diagnosable attention deficit hyperactivity disorder." (*Id.*)

As to "interacting and relating to others," Dr. Faust indicated there were no reported significant problems in A.J.'s ability to get along with others and A.J. reportedly did not need supervision or prompting from adults to interact with others. (Tr. 239.) He opined that there was "no evidence of any diagnosable psychological condition that would prevent [A.J.] from interacting and relating to others." (Tr. 239.) He also commented that Ms. Gray said she did not believe A.J. exhibited "any problematic behavior that would be consistent with any diagnosable emotional or behavioral disorder." (*Id.*)

As to self-care, Dr. Faust observed that A.J. was independent in grooming, eating, hygiene, sleeping, and toileting, but needed reminders and supervision from his mother. (Tr. 239.) He opined that A.J. did not "exhibit any behavioral or emotional condition that would

10

impair his ability to engage in self-care," but did "exhibit borderline intellectual functioning which would result in difficulty with understanding self-care tasks." (*Id.*)

### 3.    Teacher Questionnaire

On October 13, 2021, A.J.'s math and social studies teacher Rebecca Lofgren completed a questionnaire on medical and functional equivalence. (Tr. 291-94.) She reported knowing A.J. for two months and said A.J. had no evidence of limitations in the following areas: moving about and manipulating objects; self-care; and health and physical well-being. (Tr. 292-93.) She said A.J. had moderate limitations in interacting and relating to others and marked limitations in acquiring and using information and attending and completing tasks. (Tr. 291-92.) Ms. Lofgren did not know if A.J. took any medications. (Tr. 293.) She reported that A.J. had no problems with school attendance. (*Id.*) When asked if A.J. required any special accommodations, counseling, or other assistance at school or home, Ms. Lofgren reported that A.J. had an IEP and received "related services at school." (*Id.*)

### C.    Hearing Testimony

Ms. Gray testified at the June 21, 2022 hearing. (Tr. 41-53.) She said that A.J. lived with her and his younger sister. (Tr. 42.) She explained that A.J. had repeated second grade. (Tr. 48.) She said he recently completed the fifth grade, but he did not pass any of his classes; his most recent report card from May 2022 showed all Fs except for a D in physical education. (Tr. 42, 48.) Ms. Gray had not been told that A.J. was moving to the sixth grade, but she also had not been told that he would be kept in fifth grade. (Tr. 42-43.) Ms. Gray said she did not know why the school continued to move him up since his reading level was around the third-grade level. (Tr. 43.) She said he needed help with his reading and math (Tr. 43, 52) and he did not complete and/or turn in homework (Tr. 43-44). She said that A.J. had attended school both in person and

11

remotely due to Covid.  (Tr. 48-49.)  When A.J. attended school remotely, Ms. Gray had to sit with him to make sure that he completed his classes and she had to provide constant reminders to make sure he was performing the work that was required of him.  (Tr. 49.)

Ms. Gray said A.J.'s teachers had reached out to her and informed her that A.J. did not listen, did not participate, and did not focus during school.  (Tr. 44.)  She said she tried to encourage him and remind him that he had to do his work, but it went "in one ear and out the other with him."  (*Id*.)  In response to a question regarding A.J.'s large number of absences (*id*.), Ms. Gray indicated some of the absences were due to A.J. and her having Covid and some were due to family issues (Tr. 44-45.)  She said A.J. was on an IEP and received assistance at school, which included being pulled out of classes throughout the day to work one-on-one and having extra teachers with him during group activities.  (Tr. 44, 52.)  Ms. Gray reported that A.J. did not take any medication and said that she did not think that having him taking medication would make things any better because his "learning [was] really, really, really, low."  (Tr. 47.)

Ms. Gray said that A.J. was not interested in extra-curricular activities and did not have many friends, other than a cousin that he played with when they were at Ms. Gray's mother's house.  (Tr. 47-48, 49-51.)  She said that A.J. did not like to communicate or engage with other kids.  (Tr. 51.)  She also said A.J. did not like to communicate with her.  (Tr. 45.)  If A.J. did something that Ms. Gray thought was wrong and Ms. Gray asked him to tell her why he had done what he did, he could not explain why.  (Tr. 45.)  She said A.J. played on his phone for fun and occasionally watched television.  (Tr. 45-46.)  He was able to ride a bicycle.  (Tr. 46.)  He could not make change at a store.  (Tr. 52.)

She reported A.J. had no difficulty sleeping and had a good appetite.  (Tr. 47.)  He could independently perform daily, routine tasks such as making his bed, cleaning his room, brushing

his teeth, showering, and dressing, but Ms. Gray had to provide constant reminders to perform these tasks and assist him with dressing properly.  (Tr. 46-47, 50.)  For instance, he would wear mismatched socks and put shirts on inside out.  (Tr. 46.)

### III.    Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  To qualify, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it

will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

## IV.    The ALJ's Decision

The ALJ made the following findings in her July 7, 2022 decision:[3]

1.  The claimant was born in 2010. Therefore, he was a school-age child on October 28, 2020, the date application was filed, and is currently a school-age child.  (Tr. 16.)

2.  The claimant has not engaged in substantial gainful activity since October 28, 2020, the application date.  (*Id*.)

3.  The claimant has the following severe impairments: borderline intellectual functioning (BIF); and a specific learning disorder in reading.  (Tr. 16-17.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 17-20.)

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.  (Tr. 20-32.)

6.  The claimant has not been disabled, as defined in the Social Security Act, since October 28, 2020, the date the application was filed.  (Tr. 32.)

## V.    Plaintiff's Argument

Ms. Gray presents two assignments of error.  First, she argues the ALJ erred by failing to resolve conflicts regarding A.J.'s intellectual deficits and appropriately consider his impairments under Listing 112.05.  (ECF Doc. 10, pp. 1, 6-9.)  Second, Ms. Gray argues the ALJ erred in her determination that A.J. did not have a marked restriction in the domain of attending and completing tasks.  (*Id*. at pp. 1, 9-13.)

---

[3] The ALJ's findings are summarized.

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **First Assignment of Error: The ALJ Did Not Err by Failing to Resolve Conflicts in Cognitive Testing or Failing to Evaluate Impairments Under Listing 112.05**

In her first assignment of error, Plaintiff argues that the ALJ erred at step three because she "did not sufficiently resolve conflicts in A.J.'s IQ scoring and failed to evaluate the Plaintiff's intellectual disorder under an appropriate listing," specifically Listing 112.05.  (ECF Doc. 10, p. 1, 6-9.)  In response, the Commissioner argues that: "[t]here is no unresolved conflict amongst the I.Q. scores"; the ALJ considered the appropriate listing for A.J.'s diagnosed borderline intellectual functioning, Listing 112.11; and the ALJ's findings with respect to Listing 112.11 would preclude a finding that A.J. met the requirements of Listing 112.05.  (ECF Doc. 11, pp. 10-12.)  For the reasons set forth below, the Court agrees with the Commissioner.

**1.**    **The ALJ Did Not Err by Failing to Resolve a Conflict in Cognitive Testing**

Plaintiff offers limited explanation for her first argument, that the ALJ failed to resolve conflicts in A.J.'s cognitive test results, asserting simply that the ALJ failed to resolve a conflict

between (a) consultative examiner Dr. Faust's finding that A.J. was functioning in the borderline range of intelligence and (b) Dr. Faust's concurrent finding that A.J. put forth good effort on testing that measured his full-scale IQ in the extremely low range and school records regarding his school functioning and accommodations. (*See* ECF Doc. 10, pp. 8-9.)

Under Social Security Regulations, evidence is considered "inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *See* 20 C.F.R. § 416.920b(b). "If any of the evidence in [the] case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, [the SSA] will consider the relevant evidence and see if [it] can determine whether [claimant] [is] disabled based on the evidence" in the record." *See* 20 C.F.R. § 416.920b(b)(1).[4]

Here, a review of the ALJ's written decision reveals that she discussed the results of A.J.'s cognitive and achievement testing in 2020 and 2021 (*e.g.,* Tr. 18, 22-24) and his school / IEP records (*e.g.,* Tr. 18-20, 22-23), and explained:

> As noted elsewhere in this decision, the claimant attended the consultative examination in March of 2021 []. And WAIS-IV testing at that time showed that the claimant had a verbal comprehension index of 62; a visual spatial index of 64; a fluid reasoning index of 58; a working memory index of 67; a processing speed index of 45; and a full-scale IQ of 53 []. However, testing done regarding the claimant's eligibility for special education services generally indicated somewhat better test scores, albeit still below average []. However, the claimant's school records also indicated that with appropriate IEP and special education services, the claimant had improvement in his reading level between fourth and fifth grade []. While his reading level was at a first-grade level in October of 2020 [], by October of 2021, it had improved to being at the upper third-grade level []. Overall, the objective findings were somewhat inconsistent with the claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms.

(Tr. 28-29 (internal citations omitted)). The ALJ also observed it was "important to note" that:

---

[4] Additional steps may be taken to address an inconsistency, but the decision to seek additional evidence is discretionary. See 20 C.F.R. § 416.920b(b)(1)(i)-(iv) (explaining what SSA may do to resolve an inconsistency).

> claimant also had 40 unexcused absences during the 2021-2022 school year. And
> the claimant's mother had been warned in the past that significant absenteeism
> issues would significantly impact the claimant's learning. Despite his poor
> academic performance in 2021-2022, the claimant was advanced to the sixth grade.

(Tr. 24).  The ALJ also discussed Dr. Faust's mental status findings and cognitive test results,

noting that the WAIS-V measured A.J.'s IQ at 53, but that Dr. Faust observed in the mental

status examination that A.J. "could talk to an adult and understand simple questions and

directive[s], but he had difficulty comprehending complex instructions; his speech was 100

percent intelligible in all contexts, but his speech patterns were simplistic and slow, and his

though processes were concrete; [and] his attention was not limited[.]" (Tr. 30-31.)  Thus, the

ALJ considered A.J.'s cognitive and achievement test scores, mental status examination findings,

and school records in finding A.J. was not disabled.  She did not ignore the varying test scores,

but evaluated and weighed the scores in light of the whole record.

As to any suggestion that the ALJ was required to specifically address an internal

inconsistency in Dr. Faust's opinion because Dr. Faust found A.J. was functioning in the

borderline range of intelligence but put forth good effort on testing, this argument is not well-

taken.[5]  Dr. Faust's examination report reflects that he reviewed A.J.'s prior cognitive testing

from 2020 (Tr. 234) and conducted a full mental status examination that he found consistent with

prior testing (Tr. 236-37) before observing with respect to the new cognitive testing:

> [A.J.] put forth adequate effort on testing tasks but tends to be more reserved and
> withdrawn in presentation. He lacks confidence in his ability and this lowered his
> overall test performance. His performance placed him within the extremely low
> range of ability, but he is estimated to be functioning higher within the borderline
> range, consistent with his prior intellectual measures.

---

[5] Plaintiff's brief does not clearly articulate or sufficiently develop a challenge to the ALJ's findings at Step Four
that Dr. Faust's medical opinion is somewhat persuasive (Tr. 30-31), and the Court finds any such arguments have
been waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not
sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on
its bones.") (internal citations omitted) (alterations in original).

(Tr. 237-38).  Thus, Dr. Faust articulated specific reasons for finding the new cognitive testing

was not an accurate measure of functioning and based his ultimate findings regarding A.J.'s

present functioning on mental status findings that he found to be consistent with prior cognitive

testing.  (*Id.*)  The ALJ did not err by failing to specifically address a conflict between Dr.

Faust's medical opinion as to A.J.'s functioning and his observation that A.J. "put forth adequate

effort on testing tasks" but had a test performance that was impacted by his lack of confidence.

For the reasons explained above, that Court concludes that the ALJ did not commit

reversible error by failing to resolve conflicts regarding A.J.'s cognitive testing.

### 2.  The ALJ Did Not Err by Failing to Consider Listing 112.05

In support of her second argument, that the ALJ erred when she "failed to evaluate

[A.J.]'s intellectual disorder under an appropriate listing," Plaintiff argues that A.J.'s cognitive

test results from 2020 "come[] close to satisfying the 70 IQ score required by listing 112.05" and

his WAIS-V score from the consultative examination showed a full scale IQ of 53.  (ECF Doc.

10, pp. 6, 8.)  The Commissioner responds that the evidence shows a diagnosis of borderline

intellectual function—a neurodevelopmental disorder evaluated under Listing 112.11—rather

than an intellectual disorder evaluated under Listing 112.05.  (ECF Doc. 11, pp. 10-11.)

To make the step three determination that a child "meets" a listing, the child's

impairment must be substantiated by medical findings shown or described in the listing for that

impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a step three determination that a child

"medically equals" a listing, the child's impairment must be substantiated by medical findings at

least equal in severity and duration to those shown or described in the listing for that impairment.

20 C.F.R. § 416.926(a).  The claimant bears the burden at this step. *Woodall v. Colvin*, No. 5:12

CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013) ("The burden of proof at Step

Three of the sequential entitlement to children's social security benefits rests with Plaintiff.").

Listing 112.05—Intellectual Disorder—relates to a disorder "characterized by

significantly subaverage general intellectual functioning and significant deficits in current

adaptive functioning.  Signs may include, but are not limited to, poor conceptual, social, or

practical skills evident in your adaptive functioning."  *See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P,

App'x 1, § 112.00(B)(4)(a).  Disorders evaluated under Listing 112.05 "may be described in the

evidence as intellectual disability, intellectual developmental disorder, or historically used terms

such as 'mental retardation.'"  *See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P, App'x 1, §

112.00(B)(4)(b).  A claimant may satisfy Listing 112.05 by demonstrating the requirements of

112.05(A) or 112.05(B), which are as follows:

A.  Satisfied by 1 and 2 (see 112.00H):

1. Significantly subaverage general intellectual functioning evident in your
cognitive inability to function at a level required to participate in standardized
testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your
dependence upon others for personal needs (for example, toileting, eating,
dressing, or bathing) in excess of age-appropriate dependence.

OR

B. Satisfied by 1 and 2 (see 112.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually
administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or
performance IQ score (or comparable part score) of 70 or below on an
individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 112.00E1); or

b. Interact with others (see 112.00E2); or

c. Concentrate, persist, or maintain pace (see 112.00E3); or

d. Adapt or manage oneself (see 112.00E4).

*See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P, App'x 1, § 112.05(A)-(B).  Listing 112.05 is not used to evaluate neurodevelopmental disorders (112.11), such as borderline intellectual functioning.  *See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P, App'x 1, § 112.00(B)(4)(c).

Importantly, the ALJ found at Step Two of the sequential analysis that A.J. had severe mental impairments of borderline intellectual functioning and a specific learning disorder in reading.[6]  (Tr. 16.)  The ALJ did not, in contrast, find intellectual disability and/or intellectual developmental disorder to be severe impairments.  This is consistent with the medical records, which contain a diagnosis of borderline intellectual functioning from Dr. Faust, an acceptable medical source (Tr. 238), while Plaintiff has not identified medical records showing a diagnosis of intellectual disability from an acceptable medical source.  And Dr. Faust explicitly found that the clinical results Plaintiff proffers as evidence of more limited functioning were not consistent with A.J.'s observed level of functioning or prior testing.  (*Id.*)

Plaintiff does not dispute that specific learning disorders and borderline intellectual functioning are evaluated under Listing 112.11.  (ECF Doc. 10, pp. 6-7.)  *See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P, App'x 1, § 112.00(B)(9)(b) (indicating that examples of disorders evaluated

---

[6] Plaintiff's brief does not clearly articulate or sufficiently develop a challenge to the ALJ's findings at Step Two that A.J.'s severe mental impairments are borderline intellectual functioning and specific learning disorder (Tr. 16), and the Court finds any such arguments have been waived.  *See McPherson*, 125 F.3d at 995–96.

under Listing 112.11 include specific learning disorder and borderline intellectual functioning). Given that those are the only severe impairments identified at Step Two, the Court finds the ALJ did not err when she failed to address Listing 112.05 at Step Three.

Even if it were appropriate for the ALJ to address Listing 112.05, the Court agrees with the Commissioner that the ALJ's findings as to Listing 112.11 are sufficient to clearly illustrate that A.J.'s "impairments still would have been found to not meet Listing 112.05," if the ALJ had considered that listing.  (ECF Doc. 11, p. 11.)  To satisfy Listing 112.05(B), there must be evidence of an extreme limitation in one, or marked limitation in two, of the following areas of mental functioning: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself.  *See* 20 C.F.R. Pt. 404, Pt. B2 to Sbpt. P, App'x 1, § 112.05(B)(2)(a)-(d).  The ALJ considered those four areas of mental functioning when evaluating A.J.'s impairments under Listing 112.11 and concluded that A.J. had a "marked limitation [in] understanding, remembering, or applying information; mild limitation [in] interacting with others; moderate limitation [in] concentrating, persisting, or maintaining pace; and moderate limitation [in] adapting or manage oneself."  (Tr. 18-20 (emphasis in original).)  Plaintiff has not argued that these Paragraph B findings as to Listing 112.11 lacked the support of substantial evidence, and certainly has not presented evidence to demonstrate such a lack.  Given that the same findings would preclude relief under Listing 112.05, the Court finds Plaintiff has failed to demonstrate that the ALJ committed harmful error when she failed to evaluate Listing 112.05.

For the reasons set forth above, the Court finds the ALJ appropriately considered A.J.'s impairments under Listing 112.11, rather than Listing 112.05.  Further, the Court finds that any potential error in not addressing Listing 112.05 is harmless because the ALJ's articulated

findings as to Listing 112.11 would require a similar finding as to Listing 112.05(B).  Plaintiff

certainly has not met her burden to demonstrate otherwise.

Accordingly, the Court finds Plaintiff's first assignment of error is without merit.

**C.      Second Assignment of Error: Substantial Evidence Supported the ALJ's Finding of Less Than Marked Limitations in Attending and Completing Tasks**

In her second assignment of error, Plaintiff argues that the ALJ erred as a matter of law

when she found A.J. had "less than marked" limitations in the domain of attending and

completing tasks, asserting that the ALJ improperly "focus[ed] on A.J.'s cooperation,

conscientiousness, and the absence of a diagnosis of ADHD" and "fail[ed] to take significant

evidence into account when evaluating A.J.'s degree of limitation in attending and completing

tasks."[7]  (ECF Doc. 10, pp. 10-11.)  But instead of identifying specific evidence the ALJ failed to

take into account, Plaintiff simply provides a summary of evidence she finds helpful and argues

that the evidence provides "substantial evidence demonstrat[ing] that A.J. is markedly impaired

in that domain."[8]  (*Id.* at pp. 10-13.)  She also argues that the ALJ failed to draw a logical bridge

between A.J.'s limitations and accommodations and her findings.  (*Id.* at p. 13.)

As a preliminary matter, the Court notes that Plaintiff's arguments appear to rely in part

on a misapplication of the substantial evidence standard.  "'The substantial-evidence standard

. . . presupposes that there is a zone of choice within which the decisionmakers can go either

way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at

---

[7] Plaintiff asserts the ALJ referred to the domain of attending and completing tasks as concentrating, persisting, or maintaining pace.  (ECF Doc. 10, p. 11, n. 6 (citing Tr. 19).)  But the ALJ's reference to concentrating, persisting, or maintaining pace at the cited page related to her evaluation of whether A.J.'s impairments "met" or "medically equaled" the Listings.  (*See* Tr. 19.)  When addressing whether A.J.'s impairments "functionally equaled" the Listings, the ALJ correctly referred to the domain of attending and completing tasks.  (Tr. 21, 24-25.)

[8] Although Plaintiff's brief purports to identify "examples" of marked or extreme limitations in "attending and completing tasks" under Social Security regulations (ECF Doc. 10, p. 11 (citing "20 C.F.R. § 416.926a(3)"), the purported "examples" relate instead to the separate domain of "acquiring and using information," and the pertinent regulation specifically indicates that they are examples of "limited functioning" and "do not necessarily describe a 'marked' or 'extreme' limitation," *see* 20 C.F.R. § 416.926a(g)(3).  The examples therefore were not considered.

545).  That means this Court cannot overturn the ALJ's decision even if substantial evidence does support the Plaintiff's preferred finding, "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Thus, the question is not whether Plaintiff has identified substantial evidence to support a finding of "marked" limitations in attending and completing tasks, but whether Plaintiff has met her burden to show that the ALJ's contrary finding of "less than marked" limitations *lacked* the support of substantial evidence.

To find A.J.'s impairments "functionally equaled" the Listings, the ALJ had to find they were "of listing-level severity," meaning they would "result in 'marked' limitations[9] in two domains of functioning or an 'extreme' limitation[10] in one domain." 20 C.F.R. § 416.926a(a). The relevant six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Here, the ALJ found that A.J. had marked limitations in only one domain, acquiring and using information, and either less than marked or no limitations in the other five domains.  (Tr. 21.)

In support of her finding the A.J. had "less than marked" limitations in the domain of attending and completing tasks, the ALJ explained:

> At the initial level, the DDS consultant indicated that the claimant had no limitation in the domain of attending and completing tasks []. However, at the reconsideration level, the DDS consultant indicated that the claimant had less than marked limitation in this domain [].
>
> Although the claimant's mother endorsed that the claimant had some issues with inattention and distractibility [], the consultative examiner specifically found that the claimant did not show any attention problems during the examination, and he was attentive; he also showed no problems with hyperactivity, impulsivity, or

---

[9] A limitation is "marked" when an impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities"; it "is 'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i).

[10] A limitation is "extreme" when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities"; it "is 'more than marked.'"  20 C.F.R. § 416.926a(e)(3)(i).

distraction []. He noted that the claimant exhibited slower rate of speech, consistent with learning issues, but he had persistence []. And he specifically concluded that the claimant had no evidence of diagnosable ADHD during the examination [].

Furthermore, in his September of 2021 pediatric checklist, the claimant's mother indicated that the claimant was never fidgeting; unable to sit still; daydreaming too much; acting as if he was driven by a motor; or having trouble concentrating []. However, she did note that he was often easily distracted [].

The claimant's school records indicated that he required accommodations, including small groups, extended time, directions read aloud, flexible seating, frequent breaks, and prompts to stay on task []. However, his most recent IEP report from October of 2021 indicated that the claimant was attentive, cooperative, and conscientious when working on class work []. Therefore, the claimant has <u>less than marked</u> limitation within the domain of attending and completing tasks.

(Tr. 24-25 (emphasis in original) (citations removed).)

Plaintiff's assertion that the ALJ erred as a matter of law because she "focus[ed] on A.J.'s cooperation, conscientiousness, and the absence of a diagnosis of ADHD" is not supported by the record. (ECF Doc. 10, p. 10.) Instead, in support of her finding of "less than marked" limitations, the ALJ explicitly considered the medical opinions of the state agency consultants and the clinical findings and medical conclusions of the consultative examiner. (Tr. 24-25.) She acknowledged Ms. Gray's reports the A.J. had issues with attention and distractibility, but contrasted those reports with A.J.'s clinical presentation at the consultative examination and the pediatric checklist completed on A.J.'s behalf in September 2021. (*Id.*) She also acknowledged the accommodations in A.J.'s IEP, but highlighted IEP records that detailed observations of A.J.'s attentive, cooperative, and conscientious behavior in the school setting in 2021. (*Id.*)

Plaintiff's conclusory allegation that the "ALJ's analysis fail[ed] to take significant evidence into account when evaluating A.J.'s degree of limitation in attending and completing tasks" is likewise unsupported. (ECF Doc. 10, pp. 11-13.) Plaintiff points first to A.J.'s October 2020 and 2021 IEP records and failing grades. (*Id.* at pp. 11-12.) But the ALJ decision reflects

25

that the ALJ considered the contents of A.J.'s school records, including the 2020 IEP, the 2021 annual review, associated accommodations, and A.J.'s failing grades.  (*See, e.g.,* Tr. 22-23, 25.) The ALJ also noted A.J.'s significant history of poor attendance and school reminders to Ms. Gray regarding the significant impact of absenteeism on learning.  (Tr. 22.)

Plaintiff also highlights the opinion of A.J.'s teacher Ms. Lofgren.  (ECF Doc. 10, pp. 11-12.)  But the ALJ decision reflects that the ALJ discussed that opinion and found it unpersuasive due to the lack of a "specific explanation regarding the very significant limitations [Ms. Lofgren] indicated [A.J.] had in the domain[] of . . . attending and completing tasks" and the ALJ's conclusion that the opinion was "inconsistent with other significant evidence of record, including the opinions of both DDS consultants, and the consultative examiner."[11]  (Tr. 31-32.)

Plaintiff also highlights certain of Dr. Faust's clinical findings[12] and some of Ms. Gray's reports regarding A.J.'s functioning.  (ECF Doc. 10, p. 12.)  But the ALJ clearly and explicitly considered Dr. Faust's clinical findings and Ms. Gray's reports in making the relevant determination.  (Tr. 24-25.)  The ALJ also discussed the persuasiveness of Ms. Gray's statements later in her decision, finding them inconsistent with the medical opinions of the state agency consultants, consultative examiner, and A.J.'s pediatrician, and somewhat inconsistent with A.J.'s "history of conservative treatment for his impairments throughout the period in question, consisting of IEP and special education services in the school setting."  (Tr. 32.)

---

[11] Plaintiff's brief does not clearly articulate or sufficiently develop a challenge to the ALJ's findings regarding the persuasiveness of Ms. Lofgren's opinion (Tr. 31-32), and the Court finds any such arguments have been waived. *See McPherson*, 125 F.3d at 995–96.

[12] One highlighted finding, that A.J. "would have difficulty in a group setting" (ECF Doc. 10, p. 12), seemingly refers to Dr. Faust's assessment of A.J.'s abilities in "acquiring, using, and recalling information" (Tr. 239).  As to attending to and completing tasks, Dr. Faust opined: "In a group setting, he is *not* viewed to have difficulty with attention for completing tasks and is not reported to be distracted or disruptive."  (*Id.* (emphasis added).)

Having considered Plaintiff's arguments, the ALJ's written decision, and the evidentiary record, the Court finds Plaintiff has not met her burden to show that the ALJ *lacked* substantial evidence to support her finding of "less than marked" limitations in the domain of attending and completing tasks.  On the contrary, the record indicates that the ALJ appropriately considered the totality of the evidence, including the records highlighted in Ms. Gray' s brief, and made a finding that was supported by substantial evidence.  (Tr. 24-25.)  The Court further finds that the ALJ provided a written analysis that was sufficient to create "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Accordingly, the Court finds Plaintiff's second assignment of error without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.


March 7, 2025


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

27